UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:11CR127 JCH |
| ) | (FRB) |
| CUEVAS BAN'E COST, JR., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM, REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

All pretrial motions in the above cause were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). Defendant Cuevas Ban'e Cost, Jr. filed a Motion to Suppress Statements and Evidence (Docket No. 118). Testimony and evidence was heard on the motion. A written transcript of the hearing was prepared and filed with the Court (Docket No. 180). From the testimony and evidence adduced at the hearing, the undersigned makes the following findings of fact and conclusions of law.

Findings of Fact

On March 17, 2011, at about 1:00 p.m., the Kirkwood, Missouri Police Department received a telephoned citizen report of persons engaged in suspicious activity. The person making the report was the owner of Tom's Service Center, an automobile service station located at the intersection of Washington Avenue and Kirkwood Road in the City of Kirkwood. The citizen reported that

two vehicles were parked on a bank facility parking lot across the street from his service station. People were going back and forth between the cars. At least one of the people from the cars had crossed the street to his service station, used the restroom, and then returned to the cars. The citizen described the cars as a blue Nissan Altima and a silver Dodge Challenger.

Officer Larry Nilges of the Kirkwood, Missouri Police Department was dispatched to investigate the citizen report. While Officer Nilges was en route to the location, the police dispatcher related that the citizen had reported that the vehicles had now driven off of the bank parking lot. The Nissan vehicle had driven to the Kirkwood Service Center, a BP automobile service station, located directly across Kirkwood Road from Tom's Service Center. The Dodge Challenger had driven to and parked on a Walgreens parking lot located a short distance away on Kirkwood Road. A map of the area with the location of the various businesses was marked and admitted in evidence at the hearing as Government's Exhibit 3.

Upon arriving in the area, Officer Nilges saw the blue Nissan Altima parked on the BP service station lot. He pulled his police car onto the BP lot and parked about thirty feet to the rear of the Nissan auto. Officer Nilges was wearing a police uniform and driving a marked police car. Officer Nilges noticed a man and a woman standing outside the Nissan which was parked at the gasoline pump area. Officer Nilges got out of his vehicle and

approached the Nissan. As he neared, he could see that the people were having trouble putting gasoline into the car because the pump nozzle was not placed properly into the auto's gas tank. He offered to assist the persons in getting the nozzle into the car and did so. He then engaged in conversation with the woman standing by the vehicle. He learned that her name was LaPortia Byrd. Officer Nilges told Byrd that he had been dispatched to the area to investigate a suspicious persons report. Byrd admitted that the Nissan had been parked earlier on the bank lot, but denied that it was there with another car. Officer Nilges noticed that the Nissan had Georgia license plates. Byrd told Officer Nilges that she and the male standing next to the car, Cuevas Ban'e Cost, Jr., had driven to St. Louis from Georgia on the day previous and that they were visiting a casino. Byrd said that they were staying at a hotel at the casino. Officer Nilges asked Byrd who owned the vehicle and she said that the vehicle had been rented and that the rental paperwork was in the glove compartment of the vehicle. Byrd gave Officer Nilges permission to go into the vehicle and to obtain the paperwork from the vehicle. Officer Nilges noticed that there was a third person seated in the back seat of the vehicle. Officer Nilges then asked that person to step out of the vehicle. The person was determined to be Darrell L. Thomas. Officer Nilges noticed that Thomas appeared very nervous and was sweating profusely. For officer safety reasons, Officer Nilges placed

handcuffs on Thomas.

By this time, two other police cars had arrived in the area and parked on the BP lot. Cuevas Ban'e Cost, Jr., was taken to the vehicle occupied by Sergeant Wilson and was questioned by Sergeant Wilson. Cost was handcuffed by Sergeant Wilson. LaPortia Byrd was taken to another of the vehicles and questioned. Byrd said that the person seated in the back seat of the Nissan was known only to her by the name "Turk." She said that she knew "Turk" in Georgia, but that he had not come to St. Louis with she and Cost. She said that they had encountered him the evening before at the casino. Thomas, however, had told Officer Nilges that he had driven to St. Louis from Georgia with Byrd and Cost. Officer Nilges asked Byrd why they had come to the Kirkwood area from the casino and Byrd replied that they were just driving around.

Another Kirkwood police officer, Cynthia Casserly, located the Dodge Challenger parked on a lot between a Walgreens store and a Global Foods Market. She interviewed the occupants of that vehicle and determined them to be Timothy Clark, Anthony Mack and Benjamin Halter.

After the officers completed their investigation, and after it was determined that there were no outstanding warrants for the arrest of any of the individuals, all of the persons were allowed to go on their way. No one was arrested and no items of

physical evidence were seized from any of the persons or vehicles. The entire encounter lasted about one hour.

The only information obtained by police from Cuevas Ban'e Cost, Jr., during this encounter was his name, address, date of birth and social security number, and a statement that he had come to St. Louis from Georgia to gamble at a local casino. (See Govt.'s Exh. 1.)

After the individuals were allowed to leave on March 17, 2011, representatives from U.S. Bank in Kirkwood, Missouri, notified federal law enforcement authorities that an individual named Anthony Mack had earlier that day cashed a counterfeit check drawn on the account of Northern Edge Hockey, LLC, in the amount of $1,680.00 at the U.S. Bank in Kirkwood.[1]

Beginning as early as October 2010, investigators from municipalities in St. Charles County, Missouri; St. Louis County, Missouri; and the City of St. Louis, Missouri, began to notify investigators from the Postal Inspection Service and the United States Secret Service of individuals traveling from the Atlanta, Georgia, Metropolitan Area who were committing bank fraud using

---

[1]Some of the information set out in these factual findings is taken from the affidavit of United States Postal Inspector Curtis A. Brassel filed in support of a criminal complaint issued on March 25, 2011. (See Docket Nos. 1 & 2.) Prosecution of this case was originally began as a result of that complaint. Inspector Brassel also testified at the hearing on defendant Cost's Motion to Suppress. At the motion hearing, the undersigned notified the parties that the information set out in Inspector Brassel's affidavit would be considered in making these findings of fact.

area homeless individuals. According to their investigation, individuals traveled to the St. Louis Metropolitan Area to industrial complexes and stole business checks which had been left in the businesses' mailboxes. The individuals used the information contained on the checks to produce counterfeit checks which would be made payable to homeless individuals who had been recruited locally. The checks were generally drafted in amounts ranging as high as $3,400.00. The homeless individuals would be driven to banks in the St. Louis Metropolitan Area in order to cash the checks. They would be paid $200 to $400 for each check cashed or given alcohol or drugs in exchange for their participation. Law enforcement officials identified Timothy Clark, a resident of Atlanta, Georgia, as one of the participants in this scheme.

On March 24, 2011, law enforcement officers learned that Timothy Clark was staying at the Red Roof Inn located at the intersection of United States Highway 44 and Hampton Avenue in St. Louis, Missouri. After obtaining registration information from the hotel, Inspector Brassel discovered that Clark was driving a red Kia Sportage, Georgia license BKI 7344. Once the Kia Sportage was located, investigators began to conduct surveillance on the vehicle. In addition, as the earlier investigation revealed that individuals engaged in this fraudulent activity often worked in tandem with another group of individuals in different vehicles, investigators also sought to identify any other individuals or

vehicles who remained in close proximity of those in the Kia Sportage.

At the time the surveillance began, Clark was driving the Kia in which a person, later found to be Jonathan Alexander, rode as a passenger. Clark, accompanied by Alexander, stopped the vehicle at a McDonald's restaurant near the intersection of Hampton Avenue and Highway I-44, and a person later found to be Lorenzo Long, a resident of St. Louis, entered the vehicle with them. The vehicle was observed traveling to a Wal-Mart SuperCenter in Maplewood, Missouri, and then to a Home Depot Store and AT&T store in Brentwood, Missouri. Alexander got out of the Kia and entered the AT&T store. While he was inside, a light blue Nissan Altima with Tennessee plate number A25 37E, driven by a person later found to be LaPortia Byrd, arrived. Also in the Nissan Altima were a person later learned to be Cuevas Ban'e Cost, Jr., and a one-year-old infant. Cost entered the store and encountered Alexander while Byrd remained in the vehicle. Cost gave Alexander an envelope. After the meeting between Cost and Alexander at the AT&T store, Clark drove Long and Alexander in the Kia to a Fifth Third Bank located in Brentwood, Missouri. After the meeting between Cost and Alexander at the AT&T store, Cost re-entered the Nissan Altima driven by Byrd (and which contained the one-year-old infant), and Byrd drove to the Walgreens lot next to the above-mentioned Fifth Third Bank. At the Fifth-Third Bank, Long departed the vehicle

(which contained Clark and Alexander) and entered the bank.  Bank representatives informed law enforcement officers that while inside the bank, Long attempted to pass a check drawn on the account of Midwest Service Group in the amount of $1,678.99 and payable to Long.  The check contained Long's name and address.

After Long re-entered the Kia (which contained Clark and Alexander), the vehicle departed from the parking lot.  Law enforcement officials then stopped the Kia.  The check Long attempted to pass was discovered within the vehicle, i.e., the check drawn on the account of Midwest Service Group in the amount of $1,678.99.

The Nissan Altima driven by Byrd (in which Cost and the infant one-year-old were passengers) was also stopped by law enforcement officers.  A search of the vehicle revealed five counterfeit checks hidden in the gear shift panel between the driver's and front passenger's seats.  The five counterfeit checks were made payable to Long (all which contained his full name and address) in the following amounts:  Wiegmann & Associates check in the amount of $1,367.98; Rollie Johnson Inc. check in the amount of $1,678.99; Ticata check in the amount of $2,272.62; John Volpi & Company check in the amount of $1,678.99; and Olympiad Gymnastic Training Center check in the amount of $2,235.82.

At the time of the stop of the Kia automobile and the Nissan automobile, law enforcement officials did not know the

identities of any of the individuals who had been stopped other than Timothy Clark. The identities of Jonathan Alexander, Lorenzo Long, LaPortia Byrd, and Cuevas Ban'e Cost, Jr., were learned after the stops were made. Once the identities of these persons were learned, Inspector Brassel recalled them as being persons named in police reports as having been interviewed by the Kirkwood Police on March 17, 2011.

Following their arrests on March 24, 2011, LaPortia Byrd and Cuevas Ban'e Cost, Jr., both made statements to law enforcement officials. Cost made statements regarding the checks found in the Nissan automobile. Cost also told the officers that he and Byrd were staying at a Red Roof Inn hotel in St. Louis. He told the officers that the room had been rented in the name of a homeless person. Byrd told the officers that they were staying at a hotel in a room which she had rented in her name. She said she paid for the room for two nights, March 24 and March 25, to depart on March 26. Byrd described the area surrounding the hotel but could not recall the name of the hotel. Law enforcement officials were not at that time able to identify or locate the hotel. No further interview was conducted of Cost by law enforcement officers after March 24, 2011.

On March 29, 2011, Inspector Brassel learned that on that date, employees of the Homestead Suites hotel in Maryland Heights, Missouri, had entered a room at the hotel in order to clean the

room out.  The room had been rented by a person who presented identification in the name of LaPortia Byrd.  The room was rented for two adults for the nights of March 24 and 25, 2011, to depart on March 26, 2011.  (See Govt.'s Exh. 2.)  By March 29, 2011, the occupant had not paid for or extended the registration.  Hotel employees then entered the room in order to clean the room so that it could be rented to other persons.  Any property found in the room would be held for the previous occupant.  When they entered the room, the hotel employees found checks and mail in the names of various businesses, as well as a laptop with a printer.  The hotel employees then contacted officers of the Maryland Heights Police Department who then went to the hotel.  Those officers photographed the room and seized certain items found therein.  (See Govt.'s Exh. 7.)  The seized items were turned over to Inspector Brassel later that day.

## Discussion

As his first ground to suppress evidence seized from him and statements made by him, the defendant avers in his motion that his contact with law enforcement officers on March 17, 2011, was a "Terry" stop and that the stop was unlawful because the officers had no reasonable suspicion that he was engaged in criminal activity at that time.

Law enforcement officers may detain an individual for a brief period of time if they have a reasonable suspicion that

criminal activity is afoot. Terry v. Ohio, 392 U.S. 1, 30 (1968). In order to detain a person in such circumstances, an officer must have "a particularized and objective basis" for suspecting criminal activity. United States v. Jacobsen, 391 F.3d 904, 906 (8th Cir. 2004). "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." United States v. Maltais, 403 F.3d 550, 554 (8th Cir. 2005), cert. denied, 546 U.S. 1177 (2006). "While 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory [detention]." United States v. Fuse, 391 F.3d 924, 929 (8th Cir. 2004). In forming a basis for suspicion, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Ortiz-Monroy, 332 F.3d 525, 529 (8th Cir. 2003) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)). A number of factors, innocent in and of themselves, may give rise to a reasonable suspicion in the eyes of a trained law enforcement officer. United States v. Barker, 437 F.3d 787, 790 (8th Cir. 2006). During such a stop, police officers may take such steps as are reasonably necessary to protect their personal safety and maintain the status quo, United States v.

Hensley, 469 U.S. 221, 235 (1985), including handcuffing of the individuals, United States v. Marinez, 462 F.3d 903, 907 (8th Cir. 2006), cert. denied, 549 U.S. 1272 (2007).

Here, the officers were investigating a citizen report of individuals engaged in suspicious activity. The citizen described his observation that two cars were parked on a nearby bank parking lot; that persons were walking back and forth between the cars; and that at least one of the persons had walked across the street to his (the citizen's) service station and used the restroom. The citizen further reported that the two vehicles had left the bank parking lot; that one vehicle had traveled to another service station across the street from his service station; and that the second vehicle had driven a short distance down the street and parked on the parking lot of a drug store.

The Supreme Court has noted that citizen reports are generally considered a reliable basis upon which police may act. Illinois v. Gates, 462 U.S. 213, 233-34 (1983). See also United States v. Christmas, 222 F.3d 131 (4th Cir. 2000). "Courts are not required to sever the relationships that citizens and local police forces have forged to protect their communities from crime. . . . A community might quickly succumb to a sense of helplessness if police were constitutionally prevented from responding to face-to-face pleas of neighborhood residents for assistance." Christmas, 222 F.3d at 145.

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to shrug his shoulders and to allow a crime to occur or a criminal to escape. On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to . . . maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

Adams v. Williams, 407 U.S. 143, 145-46 (1972) (internal citations omitted).

The description given by the citizen as to the location and movement of the vehicles, and the actions of the persons in the vehicles provided reasonable suspicion to approach, detain and interview the persons. Based on the totality of the circumstances, the stop of the defendant on March 17, 2011, was a lawful "Terry" stop supported by objectively reasonable suspicion.

The defendant further claims that

> [t]he evidence obtained from the warrantless stop and interrogation [on March 17, 2011] led to numerous investigative leads, and provided probable cause for the secondary detention and interrogation of Mr. Cost [on March 24, 2011], in which he allegedly made a self-incriminatory statement. The government fails to show adequate justification for the original investigative detention from which the remaining investigative leads derived, and was therefore obtained in violation of Mr. Cost's Fourth Amendment rights and should be suppressed by this court.

(Deft. Cost's Mot. to Suppress, Docket No. 118 at p. 3.)

On the evidence adduced at the motion hearing, it appears that the only information obtained from the defendant during the March 17, 2011, encounter with the Kirkwood police officers was his name, date of birth, social security number, address, and his statement that he was in the St. Louis area to gamble at a casino. The defendant in no way asserts or demonstrates how any of this information, or leads derived therefrom, led to his arrest on March 24, 2011. Indeed, evidence adduced at the hearing showed that at the time of his arrest on March 24, 2011, the arresting officers were unaware of the defendant's identity and only following his arrest and after his identity was learned was it recalled that he was one of the subjects encountered by the Kirkwood police on March 17, 2011. Thus, the claim by the defendant that his arrest and subsequent statement on March 24, 2011, were the result of information obtained by the Kirkwood police on March 17, 2011, is not supported by the evidence before the Court, and serves as no basis for the suppression of evidence or statements obtained from the defendant on March 24, 2011.

The defendant claims that evidence obtained by the Maryland Heights Police Department in the search of the hotel room at the Homestead Suites on March 29, 2011, should be suppressed because the search was made without a warrant and without other lawful authority. This claim is without merit. Evidence adduced at the hearing shows that the hotel room was rented by LaPortia

Byrd on March 24, 2011, for a two-night stay, March 24 and 25, 2006, and to depart on March 26, 2011. The room booking was not further extended in any way. In <u>United States v. Perez-Guerrero</u>, 334 F.3d 778 (8th Cir. 2003), the Eighth Circuit Court of Appeals held that the defendant had no standing to challenge the search of a rented hotel room after the rental period had expired "because his expectation of privacy was lost when the rental period expired." <u>Id.</u> at 782. The court also noted that this was true even if the defendant was prevented from renewing the rental because he was in police custody after being arrested. <u>Id.</u> For this same reason, the search of the hotel room here was lawful and there is no basis upon which to suppress the evidence seized from the hotel room.

Lastly, the defendant seeks suppression of a statement that an unknown person provided him with the checks found in the hotel room. He claims that this statement was obtained as a result of the investigative stop and detention on March 17, 2011, and the warrantless search of the hotel room on March 29, 2011. At the motion hearing, evidence was introduced that the defendant made no statement to law enforcement officials about the checks found in the hotel room, and that the last interview of the defendant by law enforcement officials took place several days before the hotel room was searched and the checks were found. Thus, there appears to be no basis in fact for this claim by the defendant.

<u>Conclusion</u>

For all of the foregoing reasons, defendant Cost's Motion to Suppress Statements and Evidence should be denied.

Accordingly,

**IT IS HEREBY RECOMMENDED** that defendant Cuevas Ban'e Cost, Jr.'s Motion to Suppress Statements and Evidence (Docket No. 118) be denied.

The parties are advised that any written objections to this, Memorandum, Report and Recommendation shall be filed not later than **August 10, 2011**. Failure to timely file objections may result in waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

_____
UNITED STATES MAGISTRATE JUDGE

Dated this  _27th_  day of July, 2011.